## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CATO LAURENCIN,

    *Plaintiff*,

    v.

TOWN OF WEST HARTFORD, JEFFREY
SWANK, KATHY EARLY,

    *Defendants*.

No. 3:21-cv-00452-MPS

## RULING ON MOTION FOR SUMMARY JUDGMENT

Connecticut law prohibits some but not all uses of a cell phone while driving. This case raises the question of how much evidence police officers must have to stop a vehicle based on reasonable suspicion that a driver is engaging in a prohibited, rather than a permitted, use of a cellphone under Connecticut's statute. On February 15, 2020, Dr. Cato Laurencin was detained during a traffic stop conducted by Officers Jeffrey Swank and Kathy Early of the Town of West Hartford Police Department. Swank and Early claimed that they observed Laurencin using his cell phone in violation of Conn. Gen. Stat. § 14-296aa while operating a motor vehicle, and they issued Laurencin a written warning. Laurencin now brings this suit under 42 U.S.C. § 1983 and the Connecticut Constitution against Swank, Early, and the Town of West Hartford. He alleges that he was detained without reasonable suspicion, that Swank and Early were motivated by racial animus when they detained him, and that his detention violated the Fourth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Connecticut Constitution. Defendants deny all these allegations and, in the alternative, argue that they have qualified immunity as to Laurencin's federal claims and that the Connecticut Constitution does not provide a private cause of action for the harms alleged by Laurencin. For the reasons set forth below, I grant summary judgment as to Laurencin's claims against the Town of West Hartford

1

and part of his Equal Protection Clause claim, decline to exercise supplemental jurisdiction over Laurencin's claim under the Connecticut Constitution, and deny summary judgment as to the rest of Laurencin's Equal Protection Clause claim and his Fourth Amendment claim.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) Statements and exhibits. All facts are undisputed unless otherwise indicated. I discuss only those facts necessary to decide Defendants' motion.

On February 15, 2020, Dr. Cato Laurencin, a Black man, had a funeral to attend. ECF No. 62-1 at 39 ¶ 1. He left his home in Avon, Connecticut, at approximately 11:00am, driving alone in a 2009 Mercedes Benz CL-550. *Id.* Laurencin's Mercedes "was equipped with a Bluetooth connection that allowed for hands free calling." *Id.* ¶ 2. So before Laurencin left home, he "placed his cell phone, a Samsung Note, which was turned off, on the passenger seat" of his Mercedes. *Id.* ¶ 3.[1]

After ten minutes of driving, Laurencin was traveling east on Albany Avenue in West Hartford. *Id.*; *id.* at 1 ¶ 1. As he approached the intersection of Albany Avenue and Mountain Road, "stopping for a yellow traffic light," he noticed a "West Hartford SUV Police Cruiser" that was "stopped heading north on Mountain Road." *Id.* at 39 ¶ 4. Inside this cruiser were Officers Jeffrey Swank and Kathy Early, two officers from the Town of West Hartford Police Department who were patrolling in the area. *Id.* at 1 ¶ 2. Early was driving the cruiser; Swank was in the passenger seat. *Id.* Once the signal lights allowed traffic to proceed northbound on Mountain Road, Early began to turn left, leaving Mountain Road and turning to travel west along Albany

---

[1] Laurencin received a text message at 10:50am, but the parties dispute when he saw it. ECF No. 62-1 at 5-6 ¶ 14. I do not address this dispute because it is not material. It is undisputed that Swank and Early did not know about this text message when they detained Laurencin.

Avenue. *Id.* at 2 ¶ 3. As Early turned onto Albany Avenue, Early and Swank both saw Laurencin's Mercedes stopped at the intersection of Albany Avenue and Mountain Road. *Id.* But the parties dispute whether Swank saw Laurencin before this turn occurred, and they dispute what Swank and Early saw Laurencin doing as they turned onto Albany Avenue.

### A.     Initial Observation of Laurencin by Swank and Early

Laurencin claims that as he approached and stopped at the intersection, while Swank and Early were still stopped on Mountain Road, he noticed that Swank was "leaning forward in the passenger seat of the SUV," looking in his direction and "staring at him." *Id.* at 40 ¶ 5; ECF No. 62-5 at 13 (Laurencin testified that he "observed Officer Swank looking over at me . . . leaning forward and staring at me" when Swank and Early were stopped at the light before beginning their turn). Swank disputes this, attesting that he did not see Laurencin and his Mercedes until Early began to turn onto Albany Avenue. *See* ECF No. 62-1 at 2 ¶¶ 3-4; ECF No. 58-3 at 3-4 ¶¶ 6-7 (Swank attested in affidavit that he did not observe "a black sedan" and Laurencin until "Early was making a left turn to head west on Albany Avenue"). According to Laurencin, Swank continued to stare at Laurencin as the cruiser "began to move into the intersection and take a left turn to head west on Albany Avenue." ECF No. 62-1 at 40 ¶ 5; ECF No. 62-5 at 14 (Laurencin testified that he saw Swank "staring at me" and "continuing to stare at me" as the cruiser "turned the corner"). Swank claims to have not noticed Laurencin until Early began her turn, so he disputes that he "continued" to stare at Laurencin. Swank testified at his deposition, however, that he "could tell it was an African American male wearing a suit" in the Mercedes once Early began her turn. ECF No. 62-7 at 15-16. Swank testified that at this point he could see the front and side of Laurencin's face. *Id.* at 16.

The parties also dispute what Swank and Early saw Laurencin doing when they observed Laurencin in his Mercedes. Swank and Early claim that when they saw Laurencin's Mercedes while they were turning, they also saw Laurencin inside it "manipulating a cell phone in his hand." ECF No. 62-1 at 2 ¶ 4; ECF No. 58-3 at 4 ¶ 7 (Swank attested that he observed Laurencin "manipulating a cell phone in his right hand slightly to the right of his body" as Early was making the turn); ECF No. 58-4 at 4 ¶ 8 (Early attested that as she was turning on Albany Avenue she saw Laurencin "manipulating a black object in his hand"). Laurencin denies this, claiming that Swank and Early "could not have been able to see the cell phone until the police cruiser pulled up alongside" Laurencin's Mercedes later in the encounter. ECF No. 62-1 at 2 ¶ 4. Laurencin attested in his affidavit that this was because, "while stopped" at the intersection, ECF No. 62-2 at 3 ¶ 13, he only moved his cell phone with his right hand from the passenger seat to a position "flat on the center console, located between the front seats and below the dashboard," *id.* at 4 ¶ 15. As part of this movement, Laurencin attested "[a]t no time did [he] lift the cell phone from the center console above the dashboard or door frame," so the cell phone "would not have been visible to anyone looking through the windshield or driver's side window unless the view was from above looking down at an angle through the side windows." *Id.* Laurencin testified at his deposition that he did not hold the phone in his right hand beyond this brief movement. ECF No. 62-5 at 15. After this movement was completed, Laurencin attested that he "activated the phone by pushing a button on the side of the phone and then tapping the icons on the screen" without holding it in his hand. ECF No. 62-2 at 4 ¶ 15. He attested that he was tapping the icons on the screen to connect his phone to the Mercedes via Bluetooth, because sometimes it connects automatically but other times, he must enter a "six-digit code" and then tap his phone three

times, such that "six digits and three taps would activate the Bluetooth function." ECF No. 62-2 at 3-4 ¶ 14; *accord* ECF No. 62-5 at 31-33.

Laurencin also submits other evidence showing that the line of sight between him and the cruiser would not have permitted the officers to make the observations they say they made at the time the cruiser was turning onto Albany Avenue. His Mercedes "was stopped in the far right-hand lane of three eastbound travel lanes on Albany Avenue with cars stopped behind it, and there were at least two vehicles in each of the middle and left lanes adjacent to the Mercedes, also stopped at the light heading east, in between the Mercedes" and the cruiser when it was traveling west onto Albany Avenue. ECF No. 62-1 at 40 ¶ 6; ECF No. 62-2 at 4-5 ¶ 17.[2] Laurencin retained an expert witness, a former Connecticut State Trooper, to reenact the encounter with Swank and Early, and the evidence created from this reenactment shows that the expert — traveling as Swank and Early had traveled at the intersection while Laurencin was stopped in the far right-hand lane of Albany Avenue in similar weather and traffic conditions — could not see Laurencin's "phone below the top of the door frame and dashboard of his Mercedes" as he traveled through the intersection. ECF No. 62-3 at 3 ¶ 4. Laurencin's expert witness also filmed other reenactments of the encounter between Laurencin, Early, and Swank with similar traffic and weather conditions. *Id.* at 3-6 ¶¶ 5-9*; see* ECF No. 63 (video of reenactments). The expert found in his reenactments that he could not see a cell phone in Laurencin's vehicle, which was positioned in the Mercedes where Laurencin testified it was

---

[2] There is a dispute about whether Laurencin was in the far right-hand lane of Albany Avenue or if he was instead in the far left-hand lane, and whether there were any other cars at the intersection. ECF No. 62-2 at 4-5 ¶ 17 (Laurencin attested that he was "stopped in the far right-hand lane" with vehicles around him); ECF No. 62-5 at 20 (when asked at his deposition if there were cars behind him, Laurencin testified that there "were cars to the left of me"); ECF No. 62-8 at 5 (Early testified that Laurencin was at "the far left and in the left lane," "closest to the double yellow lines," and that there "were no other cars" near his Mercedes).

positioned, from the vantage point at which Swank and Early claimed to have seen it while they were turning onto Mountain Road. ECF No. 62-3 at 6 ¶ 10.

### B. Observation After Swank and Early Pulled Alongside Laurencin

After Early completed the turn onto Albany Avenue, Swank told Early to "conduct a U-Turn and pull up next to" the passenger side of the Mercedes. ECF No. 62-1 at 2-3 ¶ 5. As Swank and Early "came to a stop on the passenger side" of the Mercedes, they observed Laurencin "manipulating the phone in his right hand" by, at least, "swiping his thumb on the face of the phone." *Id.* at 3 ¶ 6 (Laurencin admitted to swiping).

Swank and Early claim that they observed Laurencin making more than a few swipes on his phone screen. Swank attested that he and Early both "observed [Laurencin] manipulating [his] phone the entire time [they] turned the corner and after [they] pulled up on the passenger side" of the Mercedes. ECF No. 58-3 at 5 ¶ 19*; see* ECF No. 62-1 at 10-11 ¶ 23 (defendants citing portions of the record stating this and supporting their claim that Swank and Early saw "Laurencin with his cell phone in his right hand, palm up, and manipulating the cell phone with his thumb"). But Laurencin claims that Swank and Early could not have observed him doing anything with his phone "until they were alongside" his Mercedes. ECF No. 62-1 at 9-10 ¶ 23 (citing supporting record evidence). So at most they could have seen him finishing connecting his phone to the Mercedes by "touch[ing] the Bluetooth icon to pair the Mercedes . . . with [his] phone," ECF No. 62-2 at 5 ¶ 18, because he had begun "turning on [his] phone and activating the Bluetooth connection," while the cruiser turned "left to travel west on Albany Avenue," *id.* at 4 ¶ 16.

The parties also dispute the character and timing of the interaction between them as Swank and Early turned and pulled alongside the Mercedes. Swank and Early claim that

"Laurencin did not notice" the cruiser when it pulled alongside the Mercedes, so Early had to "activate[] the vehicle's air horn to get his attention." ECF No. 62-1 at 3 ¶ 7; ECF No. 58-3 at 4 ¶¶ 8-9 (Swank attested that as the cruiser stopped next to the Mercedes, Laurencin "still had the phone in his right hand and was manipulating the phone with his hand and was still looking down on the phone," so he asked Early to sound a horn to get Laurencin's attention); ECF No. 58-5 at 12-13 (Swank testified that he told Early to get Laurencin's attention after they pulled alongside the Mercedes, and when "he didn't acknowledge her trying to get his attention," Swank told Early to sound the cruiser's horn). Early testified that she thought Laurencin did not "even notice [she and Swank were] next to him" because Laurencin's head was down, looking at his phone. ECF No. 58-6 at 16. As for timing, Swank testified at his deposition that he observed Laurencin manipulating his phone for approximately 25 seconds, ECF No. 58-5 at 28,[3] and that he and Early observed Laurencin for a "[c]ouple seconds" once they pulled alongside the Mercedes before Early sounded the air horn, *id.* at 14-16. In that two-second period, Early "rolled down the window . . .[,] waved her hand out the window trying to get [Laurencin's attention]," and then sounded the air horn. *Id.* Early testified at her deposition that she also "advised . . . Officer Swank" that Laurencin was "actually on his phone" during the period Swank identified as lasting a couple of seconds. ECF No. 62-8 at 27.

Laurencin's memory of these events is different. He claims that he did notice Swank and Early as they pulled alongside the Mercedes, because he watched the cruiser as it made its turn, ECF No. 62-1 at 41 ¶ 10, and then continued to watch it "in his rear view and side mirrors the entire time" it approached the Mercedes, *id.* ¶ 11; ECF No. 62-2 at 5 ¶ 18 (attesting that he "watched the cruiser in the rear view and side mirrors the entire time" it approached). He had the

---

[3] Laurencin disputes that he was observed for 25 seconds, contending that the period of observation was at most 10 seconds. ECF No. 62-1 at 11-12 ¶ 28; ECF No. 62-2 at 5 ¶ 18.

impression that "he was being stalked." *Id.* Laurencin also attested that the cruiser then "squeez[ed] into the space" between the Mercedes and "a guardrail in an aggressive manner." *Id.* at 4 ¶ 16. And just as he "touched the Bluetooth icon to pair the Mercedes . . . with his phone, and as the police cruiser was alongside [his] passenger window, [he] heard . . . the cruiser's air horn," and received the instruction to "lower [his] passenger window." *Id.* at 5 ¶ 18. Laurencin attested that in his estimation "it was less than 10 seconds between the time the [cruiser] made the U-turn, pulled alongside the passenger side of the Mercedes and activated the air horn." *Id.*; *see* ECF No. 62-5 at 17-18 (Laurencin testified at his deposition that he saw Swank and Early "coming through the side view mirror," that "[t]hey drove up," and then "the air horn was blown"). Once the air horn was blown, Laurencin attested that he "did not believe he was free to leave the scene." ECF No. 62-2 at 5 ¶ 18; ECF No. 62-5 at 19 (Laurencin testified at his deposition that he understood the air horn to be the police telling him to stop).

    **C.**    **Traffic Stop**

    After Early sounded the air horn, she motioned for Laurencin to lower his window; Laurencin lowered his passenger window and Early told him he could not use his phone while driving. ECF No. 62-1 at 3 ¶ 8. Laurencin responded that he was only "turning his phone on to connect to Bluetooth." ECF No. 62-1 at 4 ¶ 9. After a brief conversation, "cars began to accumulate at the light," so Early told Laurencin to pull over to the right after the traffic control signal turned green. *Id.* ¶ 11. Early told Laurencin this because Swank instructed her to. ECF No. 62-7 at 28-29. Laurencin testified that he recalled Early activating the cruiser's lights after he was told to pull over. ECF No. 62-5 at 21.

    Once Laurencin pulled over after the light, Swank and Early conducted a traffic stop. ECF No. 62-1 at 6 ¶ 15. Swank and Early approached Laurencin's vehicle, and, while Swank

observed, Early advised Laurencin "that he had been stopped because he was on his cell phone while operating a vehicle." *Id.* Laurencin continued to tell Swank and Early that "he was only turning on his phone to connect to Bluetooth." *Id.* ¶ 16. He attempted to demonstrate this action to Swank and Early. *Id.* There is no dispute that Swank, Early, and Laurencin argued about what Laurencin was doing — whether he was just turning on his Bluetooth or was instead doing something more with his phone. *Id.* at 6-7 ¶ 16-17. It is also undisputed that several times during the traffic stop Laurencin claimed that the law permitted him to activate his Bluetooth while operating a motor vehicle. *See id.* at 9 ¶ 21; ECF No. 62-2 at 7-8 ¶ 24.

The parties dispute other parts of what was said at the traffic stop. Swank and Early claim that they told Laurencin they had "observed him manipulating his cell phone the entire time he was stopped at the traffic signal," including while they turned onto Albany Avenue, conducted a U-turn, and pulled up next to Laurencin's Mercedes. ECF No. 62-1 at 7 ¶ 18; ECF No. 58-3 at 5 ¶ 19; ECF No. 58-4 at 5 ¶ 19. Further, Swank attested that he told Laurencin that Laurencin was "manipulating the phone for longer than it would take to answer or hang up a phone call or turn the phone on or off." ECF No. 58-3 at 5 ¶ 17. Early attested that she also told Laurencin that "he was manipulating his cellular phone longer than it would take to power on a cellular phone." ECF No. 58-4 at 5 ¶ 18. Laurencin denies that "either [o]fficer" said these things. ECF No. 62-1 at 7 ¶ 18; ECF No. 62-2 at 6-7 ¶ 23. Laurencin attested that Swank instead told him that "at the intersection [Swank] saw [Laurencin's] eyes were not looking up," but that Swank and Early "did not know if [Laurencin] was using a phone, stating they could not see one, so they decided to circle around to investigate [Laurencin]." ECF No. 62-2 at 6-7 ¶ 23. Swank denied at his deposition that he or Early made that statement to Laurencin. ECF No. 62-7 at 63.

Eventually, Early asked Laurencin for his license and motor vehicle registration, which he provided. ECF No. 62-1 at 8-9 ¶ 19. Laurencin also identified himself as a member of the Connecticut Racial Profiling Prohibition Project's Board and provided a card that identified him as a physician. *Id.* Shortly after that, Swank and Early left to confer, and then they returned to the Mercedes. *Id.* at ¶ 20. Once they returned, Laurencin asserted that his actions "did not violate the statute" governing phone usage in motor vehicles "based on his knowledge gained through being a Board member [of the] Connecticut Racial Profiling Prohibition Project. *Id.* at 9 ¶ 21. Early then issued Laurencin "a written warning for a violation of C.G.S. § 14-296aa" and "concluded the motor vehicle stop." *Id.* ¶ 22. Laurencin attested that Swank and Early "dismissed" his claim that he had not violated § 14-296aa "without any attempt to investigate the truth of his assertion." ECF No. 62-2 at 9-10 ¶ 30.

Laurencin attested that neither Swank nor Early asked to look at Laurencin's phone "to determine if [he] was texting or calling when stopped at the intersection." ECF No. 62-2 at 8 ¶ 26. Laurencin also attested that when he repeatedly told Swank and Early that he "was permitted to active [his] phone's Bluetooth," Swank told him "'[w]ell, at the intersection, I saw your wheels over the white line. I could get you for that.'" *Id.* ¶ 27. And Laurencin attested that at some point during his encounter with Swank and Early, Swank accused him "of stopping for the yellow light because [Laurencin] saw a police car, not because [Laurencin] was following the traffic laws," which Laurencin interpreted as Swank suggesting he was "someone of nefarious intent." *Id.* at 10 ¶ 31.

Laurencin also attested that he was treated in a "disrespectful manner" by Swank and Early once he "pulled over to the lot across the intersection." *Id.* at 9-10 ¶ 30. For example, he attested that he told Swank and Early that he was a doctor and that despite that, Early addressed

him by his first name and said "Cato, sit still," after which Laurencin said "No, I'm Dr. Laurencin"; Laurencin attested that Early gave him the impression she thought this was arrogant. *Id.* Laurencin also attested that Swank and Early refused to engage with his assertions about what conduct was permitted under § 14-296aa, which he viewed as dismissive. *Id.*

Both officers testified that they did not notice Laurencin's race when they first observed him. ECF No. 62-1 at 12 ¶ 29-30. Early further testified that she "did not observe" Laurencin's "race or gender until she rolled down the patrol vehicle window and activated her air horn and had an exchange with" Laurencin. *Id.* ¶ 30.[4]

## II.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party

---

[4] Beyond those instances I have recounted above, Defendants recite many instances in the record where Swank and Early testified that they saw Laurencin manipulating his phone, providing details about their observations. ECF No. 62-1 at 14-21 ¶¶ 39-53. Laurencin disputes the truth of these observations. *See id.* Any substantive evaluation of this testimony would require making credibility determinations, which I may not do at the summary judgment stage. Defendants also spend many pages reciting the dueling conclusions of the two expert witnesses in this case — a battle I may not resolve at this stage either. ECF No. 62-1 at 21-29 ¶¶ 55-80.

carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## III.   DISCUSSION

### A.    Count One: Unreasonable Search and Seizure

As is evident from my recitation of the factual disagreements between the parties, there are genuine issues of material fact that preclude summary judgment on Laurencin's Fourth Amendment claim.

The first issue is *when* Swank and Early seized Laurencin. A Fourth Amendment seizure must be "'justified at its inception.'" *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The "seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained." *Id.* A person "has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Such circumstances include the "threatening presence of several officers . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* Defendants argue that Laurencin was not seized within the meaning of the Fourth Amendment until Swank and Early told him to pull over beyond the intersection of Albany Avenue and Mountain Road and activated their cruiser's flashing lights. ECF No. 58-1 at

17 n.2. Laurencin, however, argues that "he believed he was not free to leave once the officers activated the air horn and directed him to lower his passenger window." ECF No. 62 at 18.

Viewing the evidence in the light most favorable to Laurencin, I conclude that a reasonable jury could find that a reasonable person in Laurencin's shoes would not have believed he was free to leave when Early sounded the cruiser's air horn and directed him to lower his window. Defendants argue that they only used the air horn to get Laurencin's attention, noting that their expert testified that Swank and Early were just "blowing the horn to get his attention" and had not "given [Laurencin] any instructions." ECF No. 58-1 at 17 n.2. This argument ignores that Early instructed Laurencin to lower his window immediately after she sounded the air horn. And there are material disagreements about the events leading up to Early's sounding the air horn. Defendants claim that Swank and Early executed their turn and drove alongside Laurencin's Mercedes over the course of 25 seconds, *see* ECF No. 58-5 at 28, and that Laurencin did not notice them approach because his head was down and he was looking at his phone, ECF No. 58-6 at 16. They claim that Early then rolled down her window and waved her hand out of it, trying to get Laurencin's attention, ECF No. 58-5 at 14-16, while telling Swank that Laurencin was on his phone, ECF No. 62-8 at 27. In their version of events, Early sounded the air horn only after these other efforts to get Laurencin's attention had failed.

In Laurencin's telling, however, he was aware of Swank and Early the entire time. Even before the cruiser began moving through the intersection, he noticed Swank "staring" at him, which Swank continued to do as the cruiser drove into the intersection and onto Albany Avenue. ECF No. 62-2 at 3-4 ¶ 12, 16.  And as the cruiser made a U-turn and pulled alongside him, he observed it "the entire time" from his rear and side view mirrors. ECF No. 62-1 at 41 ¶ 10; ECF No. 62-2 at 5 ¶ 18. He claims that the officers' cruiser approached him very quickly, as he recalls

there being "less than 10 seconds between the time the [cruiser] made the U-turn, pulled alongside the passenger side of the Mercedes and activated the air horn." ECF No. 62-2 at 5 ¶ 18. And he claims that Early drove into the space between his Mercedes and the "guardrail in an aggressive manner," ECF No. 62-2 at 4 ¶ 16, before almost immediately sounding the air horn and then instructing Laurencin to lower his window. A reasonable jury could find that a reasonable person in these circumstances would not feel free to leave once the police officer who was driving the cruiser pulled alongside, sounded the air horn, and gave an instruction to lower the window. When these facts are viewed in the light most favorable to Laurencin, Swank and Early aggressively approached Laurencin and sounded the air horn before Early commanded Laurencin to speak with her, and thus to stay where he was, stopped at a busy intersection. There is thus a genuine dispute of material fact as to when Laurencin was seized by Swank and Early, i.e., whether it was when Early sounded the horn and gave the instruction to lower the window or a few minutes later, when she instructed him to pull over after the intersection and turned on the emergency lights.

The second issue is *whether* Swank and Early had reasonable suspicion to stop Laurencin. Police officers are permitted in "appropriate circumstances and in an appropriate manner [to] approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry,* 392 U.S. at 22. But they may only do so if there is "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (internal quotation marks omitted). Reasonable suspicion is more than a "hunch" and requires "specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting wrongdoing." *United States v. Bailey*, 743 F.3d

322, 332 (2d Cir. 2014) (internal quotation marks and citations omitted). "The standard is not high," however, and is "less than probable cause." *Id.* When assessing reasonable suspicion, a "court must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene." *Id.* (internal quotation marks and citation omitted).

Defendants argue that Swank and Early "had reasonable suspicion that [Laurencin] had violated or was in the process of violating Connecticut law related to use of hand-held mobile telephones and mobile electronic devices by motor vehicle operators, codified in Connecticut General Statutes § 14-296aa." ECF No. 58-1 at 13. Connecticut General Statutes § 14-296aa states that "no person shall operate a motor vehicle upon a highway . . . while using a hand-held mobile telephone to engage in a call or while using a mobile electronic device." Conn. Gen. Stat. § 14-296aa(b)(1). "'Engage in a call' means talking into or listening on a hand-held mobile telephone, but does not include holding a hand-held mobile telephone to activate, deactivate or initiate a function of such telephone." *Id.* § 14-296aa(a)(6). Use is defined as "holding a hand-held mobile telephone to, or in the immediate proximity of, the user's ear." *Id.* § 14-296aa(a)(2). But "[a]n operator of a motor vehicle who types, sends or reads a text message with a hand-held mobile telephone or mobile electronic device while operating a motor vehicle shall be in violation of this section" even if the phone is not near his or her ear. *See id.* § 14-296aa(b)(1).

Defendants argue that a reasonable and cautious officer who had observed what they observed had enough information to form a reasonable suspicion that Laurencin was using his phone in a way prohibited by § 14-296aa. They rely on testimony and affidavits from Swank and Early about what they observed before they stopped Laurencin with the air horn, ECF No. 58-1 at 13, 15, 16-17, and on the conclusions of the expert witnesses in this case, *see id.* at 15-16. For example, Swank and Early testified that they saw Laurencin manipulating his cell phone, using

15

his right hand and with his head down, as they were turning onto Albany Avenue; indeed, Swank testified that he observed Laurencin manipulating his phone for approximately 25 seconds before Early signaled Laurencin with the air horn. ECF No. 58-5 at 28. But Laurencin disputes that the officers observed what they claim they did. He points to evidence in the record that neither Swank nor Early would have been able to see him manipulating his phone until Early pulled the cruiser alongside Laurencin's Mercedes because his phone was lying flat on the center console of the Mercedes, below the windshield and the officers' line of sight. *See* ECF No. 62-2 at 4-5 ¶ 17; ECF No. 62-3 at 3-4 ¶ 4-9. Laurencin also attested that Swank told him that he and Early "did not know if [Laurencin] was using a phone, stating they could not see one, so they decided to circle around to investigate [Laurencin]." ECF No. 62-2 at 6-7 ¶ 23; *but see* ECF No. 62-7 at 63 (Swank testified that neither he nor Early made that statement). And Laurencin points to evidence that he was observing the police cruiser using his mirrors and — when inferences are drawn in his favor — thus not looking down at his phone as Early drove the cruiser alongside Laurencin's Mercedes. *See* ECF No. 62-1 at 41 ¶ 10.

Further, Laurencin submits evidence that, when viewed in the light most favorable to him, shows that once Early pulled alongside the Mercedes, Swank and Early observed him for at most two seconds "touch[ing] the Bluetooth icon to pair the Mercedes . . . with [his] phone" while his phone lay on the center console of the Mercedes. *See* ECF No. 62-2 at 5 ¶ 18. Resolving these disputes in Laurencin's favor, a reasonable jury could find that Early and Swank could not see what, if anything, Laurencin was doing with his right hand or his phone until they pulled alongside the Mercedes and observed Laurencin for two seconds tapping the Bluetooth icon on the screen of the phone, and that Early then sounded the air horn and detained Laurencin. A reasonable jury could find that, armed with only these two seconds of observation of

Laurencin's touching a cell phone, a reasonable and cautious officer would not have developed specific and articulable facts that Laurencin had violated § 14-296aa.

§ 14-296aa does not prohibit "holding a hand-held mobile telephone to activate, deactivate or initiate a function of such telephone." Conn. Gen. Stat. § 14-296aa(a)(6). So it is not a violation of the statute to tap a Bluetooth icon while operating a vehicle. *See State v. Dunbar*, 165 Conn. App. 93, 98-100 (2016) (reversing conviction under Conn. Gen. Stat. § 14-296aa because evidence showed that "defendant was seen holding a cell phone in his hand that . . . was no further from his ear than the length of his arm," but there was no evidence that defendant was using the phone to engage in a call, and merely holding the phone is "within the statutory exception for holding a phone to activate or initiate a function on it, which does not constitute 'engaging in a call' as a matter of law"). There are thus genuine factual disputes about what Swank and Early actually observed and whether those observations were sufficient to form a reasonable suspicion that Laurencin violated § 14-296aa in the period before they sounded the air horn.

To be sure, after Early sounded the cruiser's air horn, she, Swank, and Laurencin engaged in a discussion about how Laurencin was manipulating his phone. To the extent this subsequent discussion is relevant to the formation of reasonable suspicion, however, it does not help the Defendants here, because it came too late to affect the analysis of the seizure that at least arguably occurred when Early sounded the horn. As noted, a Fourth Amendment seizure must be "'justified at its inception,'" *Simmons*, 560 F.3d at 105 (quoting *Terry*, 392 U.S. at 20), and, as shown, there is a genuine dispute about whether the officers detained Laurencin before they spoke to him. So "the parties' dispute about the initiation of the traffic stop presents a genuine

17

issue of material fact that precludes summary judgment on the issue of reasonable suspicion." *Marchand v. Hartman*, 395 F. Supp. 3d 202, 215 (D. Conn. 2019).

Defendants argue that even if there was not reasonable suspicion to seize Laurencin, they are entitled to qualified immunity on his Fourth Amendment Claim. "The doctrine of qualified immunity protects government officials from suit if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (internal quotation marks omitted). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Id.* Defendants argue that they are entitled to qualified immunity because "it was objectively reasonable for Officers Early and Swank to effectuate the traffic stop upon observing the Plaintiff manipulating his cell phone and believing that all actions were constitutional and were objectively reasonable." ECF No. 58-1 at 25. They claim that the "evidence here unequivocally demonstrates that the officers both independently viewed the plaintiff manipulating his cell for an extended period of time," so it was "objectively reasonable for the officers to conduct the traffic stop upon observing the Plaintiff manipulating his cell phone." *Id.* at 27; *see also* ECF No. 66 at 8-10 (relying again only on Swank's and Early's claimed observations as establishing qualified immunity). Defendants' qualified immunity argument is thus premised on their argument that the facts supporting their claim of reasonable suspicion are undisputed. They are not. And Defendants fail to address Laurencin's version of events.

At the time Laurencin was stopped, clearly established law prohibited a traffic stop absent reasonable suspicion or probable cause. *Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."); *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017) (explaining that an officer making a traffic stop must "have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity"). It was also clearly established law at the time that Laurencin was stopped that a vehicle operator could not be convicted under § 14-296aa for merely holding a phone in his or her hand, or activating a function of the phone, while driving. When "the alleged violation of a constitutional right turns on an analysis of state, rather than federal law, it is the state courts' interpretation of the law that is most significant." *Huaman on behalf of J.M. v. Tinsley*, No. 3:13-CV-484 (MPS), 2017 WL 4365155, at *15 (D. Conn. Sept. 28, 2017) (internal quotation marks omitted). "[S]tatutes can also be a source" of law for the purpose of identifying whether a right was clearly established. *Id.* (citing cases). "[T]he salient question is whether the state of the law gave the officers fair warning that their alleged treatment of the plaintiff was unconstitutional." *Id.* As of the February 2020 traffic stop, there was Connecticut Appellate Court precedent specifically interpreting the scope of § 14-296aa. As I discussed above, in *State v. Dunbar*, 165 Conn. App. 93, 98-100 (2016), the court overturned a conviction under § 14-296aa because the evidence showed only that the "defendant was seen holding a cell phone in his hand that . . . was no further from his ear than the length of his arm," but there was no evidence that defendant was using the phone to engage in a call. *Id.* at 99. *Dunbar* held that merely holding a phone is "within the statutory exception for holding a phone

to activate or initiate a function on it, which does not constitute 'engaging in a call' as a matter of law." *Id.* at 99-100. Also, the language of § 14-296aa makes clear that a person does not violate the statute by "holding a hand-held mobile telephone to activate, deactivate or initiate a function of such telephone." Conn. Gen. Stat. § 14-296aa(a)(6). *Dunbar* and the language of § 14-296aa provided Swank and Early fair warning that they could not detain a motor vehicle operator if they observed only that he or she was holding a phone — in this case for two seconds — and tapping its screen briefly.

Further, when the record is construed in Laurencin's favor, it was not objectively reasonable for Swank and Early to believe that their conduct was lawful. Under Laurencin's version of events, they had no valid reason to stop him because they had not seen him touch his phone — which lay flat on the center console and was not in his hand — until they pulled alongside him and then only for two seconds. Because the statute allows some touching of a cellphone while operating a vehicle "to activate, deactivate, or initiate a function" of the phone, and because activating, deactivating, or initiating a function of a cell phone might reasonably be expected to take two seconds, the officers' observations during those two seconds did not supply them with "specific and articulable" facts that Laurencin was violating the statute. So it was not objectively reasonable for the officers to believe that detaining Laurencin on the strength of those two seconds alone was lawful. And yet that is all that the *undisputed* evidence in the record suggests they had when Early sounded the air horn. I conclude that because "there are genuine issues of material fact as to whether [Swank and Early] had reasonable suspicion to make the traffic stop, Defendant[s'] qualified immunity defense must be rejected, without prejudice, at this stage until factual determinations related to the existence of reasonable suspicion are made by a

jury." *Stancuna v. Iovene*, No. 3:08-CV-30 (JBA), 2018 WL 1368904, at *6 (D. Conn. Mar. 15, 2018).[5]

### B.    Count Two: Denial of Equal Protection

Laurencin alleges in Count Two that Swank and Early violated the Equal Protection Clause because his traffic stop was the result of "racial profiling," and that Swank and Early thus treated him "differently than similarly situated citizens operating motor vehicles in the Town of West Hartford who were not black." ECF No. 37 at 6 ¶ 28. "To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000). "There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause," such as for a plaintiff to "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *Id.* A plaintiff may also plead "selective enforcement of the law based upon his or her membership in a particular class, compared with others similarly situated." *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013), *aff'd,* 572 F. App'x 15 (2d Cir. 2014) (internal citations omitted); *see LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir. 1980).

Defendants argue that Laurencin has only alleged "a claim under the Equal Protection Clause on a theory of selective enforcement." ECF No. 58-1 at 6*; see id.* at 9 (denying that Laurencin has "pled a discriminatory application of a facially neutral law"). Laurencin's equal protection claim, however, alleges more than just a selective enforcement theory because it

---

[5] I decline to address Defendants' arguments that Swank and Early had probable cause to issue a warning to Laurencin because if the facts are construed in Laurencin's favor, as they must be, the seizure, and thus any Fourth Amendment violation, occurred well before Early issued the warning. In any event, this argument, too, relies on testimony and attestations from Swank and Early about what they saw Laurencin doing before Early sounded the cruiser's air horn. *See* ECF No. 58-1 at 18-22. As I have explained, these observations are disputed.

incorporates by reference all his previous allegations and does not state that it is bringing only a selective enforcement claim. ECF No. 37 at 5-6. Read as a whole, and in the light most favorable to Laurencin, as they must be, Laurencin's allegations assert that he was racially profiled, which is a type of selective enforcement claim, *and* that Swank and Early applied § 14-296aa, which is facially neutral, in an intentionally discriminatory manner, although I acknowledge that the latter claim is one barely discernible in the complaint. *See, e.g.*, ECF No. 37 at 3 ¶ 15 ("After Plaintiff pulled over, Plaintiff was informed by Defendant Officer Early that because his eyes were not looking up when at the red light, Defendants Officer Early and Officer Swank decided to investigate him."); *id.* at 6 ¶ 29 ("Defendants . . . violated Plaintiff's right to equal protection . . . when [they] seized [him] and his vehicle, in an illegal traffic stop as described in the preceding paragraphs in this complaint."). He has thus "stated a claim under the Equal Protection Clause on two alternative theories of liability[:] . . . discriminatory application of a facially neutral law . . . and selective enforcement of the law compared to similarly situated comparators." *Savino*, 983 F. Supp. 2d at 301–02. The duality of Laurencin's equal protection claim matters because, as discussed below, Laurencin's burden on the discriminatory application claim is lighter than his burden on the selective enforcement claim.

### 1. Discriminatory Application

"[A] plaintiff who . . . alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner . . . is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001). Instead, a plaintiff need only demonstrate "that the application of the law was motivated by discrimination." *Savino*, 983 F. Supp. 2d at 302. In doing so, "a plaintiff *need not* prove that a government decisionmaker was

motivated solely, primarily, or even predominantly by his or her race"; a plaintiff need only show that the decision was "motivated at least in part" by race, at which point "a defendant must show that the same result would have been reached even without the impermissible consideration." *Savino*, 983 F. Supp. 2d at 302–03 (internal quotation marks omitted, emphasis in original). "If the defendant comes forward with no such proof or if the trier of fact is unpersuaded that race did not contribute to the outcome of the decision, the equal protection claim is established." *United States v. City of Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996) (quoting another case). "Discrimination can be proved with direct evidence or with inferences drawn from statistical evidence or other circumstantial evidence." *Gilbert v. Newton*, No. 3:13-CV-1715 JCH, 2015 WL 3755955, at *4 (D. Conn. June 15, 2015).

Defendants argue that "race was not a factor" in the officers' decision to stop Laurencin, ECF No. 58-1 at 8, and that "there is no evidence in the record that [§ 14-296aa] was discriminatorily applied," *id.* at 10. But they do so based entirely on the (contested) deposition testimony and affidavits from Swank and Early. After Laurencin identified record evidence that he believes establishes a material dispute about Swank and Early's intent in his brief, ECF No. 62, Defendants failed to address that evidence in their reply brief and continued to rely on the testimony and affidavits from Swank and Early as if their version of events was undisputed, ECF No. 66 at 2-3. Laurencin has pointed to enough record evidence to establish a genuine dispute of material fact as to whether Swank and Early were motivated at least in part by race when they detained him.

Viewed in the light most favorable to Laurencin, the evidence in the record indicates that Swank was leaning forward in the police cruiser and staring at Laurencin before Swank and Early began their turn onto Albany Avenue. ECF No. 62-5 at 13 (Laurencin testified that he

23

"observed Officer Swank looking over at me . . . leaning forward and staring at me" when Swank and Early were stopped at the light before beginning their turn). He continued to stare at Laurencin as Early turned the cruiser into the intersection and onto Albany Avenue. *Id.* at 14 (Laurencin testified that he saw Swank "starting at me" and "continuing to stare at me" as the cruiser "turned the corner"). Further, Swank admitted at his deposition that he "could tell it was an African American male wearing a suit" in the Mercedes once Early began her turn. ECF No. 62-7 at 15-16. And it was Swank who instructed Early to "conduct a U-Turn and pull up next to" the passenger side of Laurencin's Mercedes once Early completed her turn onto Albany Avenue, ECF No. 62-1 at 2-3 ¶ 5, and who instructed Early to tell Laurencin to pull over past the light for a traffic stop, ECF No. 62-7 at 28-29. A reasonable jury could infer from this evidence that Swank was particularly interested in Laurencin, had identified him as an African American man, and was the officer who instigated the traffic stop.

A reasonable jury that resolved in Laurencin's favor the disputes about what Swank and Early could see during their encounter with Laurencin — which is what I must do at this stage — would also find that the officers did not see Laurencin doing anything with his phone until the two-second period before they detained him by sounding an air horn. At most, they saw Laurencin look down briefly when they turned onto Albany Avenue, ECF No. 62-2 at 6-7 ¶ 23 — which by itself is a thin basis for suspicion — and later quickly touch his phone to activate Bluetooth after they pulled alongside his Mercedes, ECF No. 62-2 at 5 ¶ 18. Such a reasonable jury could also find, given the sharply conflicting accounts of where Laurencin's hand and phone were when the officers first observed him, that both officers were lying when they wrote in their May 2020 reports that they observed Laurencin holding a phone or "black object" while Early was making the turn onto Albany Avenue. *See* ECF Nos. 58-3 at 9, 58-4 at 9. From there, it

would be reasonable to infer that they were lying to hide their true reasons for stopping Laurencin.

A reasonable jury could also credit Laurencin's impressions about the way Swank and Early dealt with him. Laurencin claimed that Swank and Early approached his Mercedes in a way that gave him the impression that "he was being stalked," ECF No. 62-1 at 41 ¶ 11, and his averments that Swank continually "stared" at him, that the cruiser conducted a U-turn, and that it then pulled alongside him "in an aggressive manner," ECF No. 62-2 at 4 ¶ 16, provide some support for his impression. Laurencin also attested that he was treated in a "disrespectful manner" after he "pulled over to the lot across the intersection." *Id.* at 9-10 ¶ 30. Specifically, he identified himself as a physician, Early then used his first name when stating "Cato, sit still," Laurencin corrected Early and asked to be addressed by his title, stating "No, I'm Dr. Laurencin," and Early then betrayed that she thought that statement "was arrogant." *Id.* Also, according to Laurencin, Swank and Early "refus[ed] . . . to take the time to review the statute in order [to] address [Laurencin's] assertion that [he] was not engaged in illegal activity," even when Laurencin had identified himself "as a member of the Racial Profiling Prohibition Project Advisory Board." *Id.* Further, Laurencin attested that when he told the officers that the statute does not prohibit touching one's phone altogether, Swank responded that "'[w]ell, your wheels were over the white line at the intersection, I could get you for that.'" *Id.* And Laurencin avers that Swank also "accused [him] of stopping for the yellow light because [he] saw a police car, not because [he] was following the traffic laws." *Id.* at 10 ¶ 31. Finally, during the stop, Swank and Early showed no interest in examining Laurencin's phone to determine whether he had been texting or making or receiving a call. Drawing all inferences in Laurencin's favor, a reasonable jury could find from this that Swank and Early were not actually interested in determining

whether Laurencin had violated § 14-296aa but were, instead, motivated by other, unstated considerations.

Though the evidence is not overwhelming, when viewed in the light most favorable to Laurencin, it suggests that the decision to stop Laurencin was motivated at least in part by a racially discriminatory purpose. So now "the burden shifts to the defendant[s] to show that the same result would have been reached even without consideration of race." *City of Yonkers*, 96 F.3d at 612 (quoting another case). Defendants do not attempt to make this showing in their briefing; instead, they argue only that there is no evidence of discriminatory purpose. So Laurencin has done enough to raise a genuine dispute of material fact on his discriminatory application equal protection claim to warrant a trial.[6]

### 2.   Selective Enforcement

"To successfully demonstrate selective enforcement in violation of the equal protection clause of the Fourteenth Amendment, a plaintiff must show both (1) that [he or she was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish[] the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Azana v. City*

---

[6] Although Defendants argue Swank and Early are also entitled to qualified immunity on Laurencin's equal protection claim, ECF No. 58-1 at 22-27, their arguments are primarily directed at the officers' observations of Laurencin's cell phone use and whether it justified the traffic stop under the Fourth Amendment, *e.g.*, *id.* at 26 ("qualified immunity would attach because not 'every reasonable official' in Officer Swank and Officer Early's shoes would have understood 'beyond debate' that effectuating a traffic stop upon observing a subject manipulating his cell phone would constitute an unreasonable search and seizure or violate[] equal protection"). Their arguments do not support the grant of qualified immunity. The prohibition against the application of a neutral law because of race was clearly established at the time Swank and Early stopped Laurencin, *see Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886), as was the prohibition against the selective enforcement of a law based on someone's race, *see LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980). Also, "it is unreasonable to believe that applying or enforcing a law based on someone's [race] does not violate the Fourteenth Amendment, and no official of reasonable competence would disagree." *Savino*, 983 F. Supp. 2d at 309. Because Laurencin has established genuine disputes of material fact as to whether Swank and Early acted with racial animus, I must reject the officers' qualified immunity defense as to Laurencin's equal protection claim.

*of W. Haven*, No. 3:10CV883 JBA, 2012 WL 264559, at *9 (D. Conn. Jan. 27, 2012) (first alteration in original, internal quotation marks omitted). "The analysis concerning the second element—the impermissible consideration of [Laurencin's race]—is identical to that discussed in the" discriminatory application claim analysis above, and so I find that there are genuine issues of material fact regarding this element. *Savino*, 983 F. Supp. 2d at 305. As to the first element, however, Laurencin has not pointed to record evidence establishing that he was treated differently from other similarly situated individuals, and so I grant summary judgment on his selective enforcement theory of liability.

Because Laurencin alleges selective enforcement of § 14-296aa based on his race, he must identify similarly situated drivers who are not of his race, who were operating vehicles in the Town of West Hartford, and who were treated differently when they manipulated a phone similarly to how Laurencin claims he manipulated his phone. "District courts in this circuit have noted that [s]imilarly situated does not mean identical, but rather a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, to the extent that an objectively identifiable basis for comparability exists." *Id.* (internal quotation marks omitted, alteration in original). Generally, whether people are similarly situated "is a factual issue that should be submitted to the jury," although summary judgment may be granted "where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Village of Mineola,* 273 F.3d 494, 499 n. 2 (2d Cir.2001).

Laurencin alleges in his third amended complaint that he was treated "differently than similarly situated citizens operating motor vehicle in the Town of West Hartford who were not black." ECF No. 37 at 6 ¶ 28. He fails to substantiate this conclusory allegation with any record evidence at summary judgment. Laurencin's Local Rule 56(a)2 statement is devoid of any

assertions about other drivers in the Town of West Hartford or any statistical evidence suggesting selective enforcement of § 14-296aa. *See* ECF No. 62-1. Further, in his response to Defendants' motion for summary judgment, the only comparator to which he refers is a White passenger whom Swank allegedly declined to ticket in 2016 for not wearing a seatbelt when Swank issued tickets for not wearing seatbelts to the Hispanic driver and Black passenger in the same vehicle. ECF No. 62 at 35-37. This White passenger is not similarly situated to Laurencin. He was not operating a vehicle, and neither he nor the other people in the vehicle were suspected of violating § 14-296aa. A different statute, the seatbelt law, was involved in that case, and so that case says nothing about whether Swank selectively enforced the cellphone law against Laurencin. No reasonable juror could find a reasonably close resemblance between the facts of that case and this one. Because "[t]he evidentiary cupboard here . . . is bare, containing no information concerning disparate treatment of similarly situated individuals or any other facts suggesting selective prosecution," I grant Defendants' motion for summary judgment on Laurencin's selective enforcement theory. *Miller v. Terrillion*, 391 F. Supp. 3d 217, 226 (E.D.N.Y. 2019).

C.     **Count Three: Municipal Liability**

In his third amended complaint, Laurencin alleges that the Town of West Hartford "has failed to adopt and/or enforce policies that prevent racial profiling," and that this failure led to the constitutional violations in this case, making the Town liable under § 1983. ECF No. 37 ¶ 32.

A municipality "may not be sued under section 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Under *Monell*, a municipal government is subject to suit under § 1983 only if the "execution of [the] government's policy or custom ... inflicts the [alleged] injury." *Id.* "To satisfy

this requirement, general and conclusory allegation[s] of an unconstitutional policy or custom are insufficient . . . . Rather, a plaintiff must identify either an express rule or regulation, a practice that was so persistent or widespread as to [carry] the force of law, or misconduct of subordinate employees that was so manifest as to imply the constructive acquiescence of senior policy-making officials." *Swinton v. Livingston Cnty.*, No. 21-1434, 2023 WL 2317838, at *1 (2d Cir. Mar. 2, 2023) (internal quotation marks and citation omitted, alterations in original).

Defendants argue that Laurencin "cannot establish a policy or practice" under *Monell*. ECF No. 58-1 at 29-30. Laurencin concedes this, stating that he "does not contest Defendants' position on *Monell* liability in Count Three." ECF No. 62 at 2 n.2. "When a party fails to address one of the moving party's grounds for summary judgment, the court may deem the claim abandoned and grant summary judgment in favor of the moving party on that ground." *Risica ex rel. Risica v. Dumas*, 466 F. Supp. 2d 434, 438 (D. Conn. 2006). I grant Defendants summary judgment on Count Three.

### D.    Count Four: State Constitutional Claims

In Count Four of his third amended complaint, Laurencin alleges that Defendants violated "Article First, §§ 7 and 9 of the Connecticut Constitution when Defendants seized Plaintiff and his vehicle . . . without reasonable suspicion or probable cause to do so." ECF No. 37 at 8 ¶ 34. The Connecticut Supreme Court created a private right of action for money damages based on violations of § 7 and § 9 of the Connecticut Constitution in *Binette v. Sabo*, 244 Conn. 23 (1998). Defendants argue that the right of action authorized by *Binette* is a narrow one, such that only facts "near the realm of those set forth in *Binette*," which involved a person who was "slammed repeatedly against a car" and "struck in the head and kicked[] while on the ground experiencing a seizure," will suffice to make out this type of claim. ECF No. 58-1 at 40.

29

Laurencin responds, however, that some "decisions in this District have determined that 'egregious' conduct is not a prerequisite to stating a private cause of action" under *Binette*. ECF No. 62 at 24 (citing cases). Laurencin relies on the reasoning set forth in *Gilbert*, 2015 WL 3755955, at *2. *See id.* at 25.

In that decision, Judge Hall noted that "[c]ourts in this District have diverged on the issue of whether *Binette* created a cause of action for every violation of sections 7 and 9 or only for those violations that are sufficiently egregious." *Gilbert*, 2015 WL 3755955, at *2. After reviewing the reasoning in *Binette*, Judge Hall noted that the Connecticut Appellate Court's opinion in *Martin v Brady*, 64 Conn.App. 433 (2001) posed a problem for any litigant seeking to bring a *Binette* action for non-egregious conduct. *Id.* at *4 (citing *Martin v. Brady,* 64 Conn.App. 433, 441 (2001) ("We are not persuaded that these allegations, if true, rise to the level of egregious misconduct. They are a far remove from the allegations of misconduct that underlay *Binette.*"), *aff'd on other grounds,* 261 Conn. 372 (2002)). She chose not to follow the *Martin* opinion because federal courts are not "bound to apply the law as interpreted by a state intermediate appellate court" if there is "is persuasive evidence that the highest court of the state would reach a different conclusion," and she found such evidence in another opinion of the Connecticut Supreme Court. *Id.* (citing cases). But even after *Gilbert*, other courts in this District have disagreed with Judge Hall and declined to extend *Binette* to conduct that is not egregious. *E.g.*, *Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2019 WL 2785594, at *19-20 (D. Conn. July 2, 2019). This novel and complex question of state law has not yet been resolved by the Connecticut Supreme Court. I decline to exercise supplemental jurisdiction over this claim and dismiss it without prejudice to Laurencin's reasserting this claim in state court.

With certain exceptions not relevant here, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may, however, decline to exercise supplemental jurisdiction over a claim that "raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Laurencin's state constitutional claim relies on a novel and undeveloped issue of state law, and several judges in this District have disagreed about its proper resolution. Given this, and in light of the fact that the parties devote only three full pages of briefing between them to this issue, *see* ECF No. 58-1 at 39-40; ECF No. 62 at 24-26, I find that "economy, convenience, fairness, and comity will be served by deferring to" Connecticut courts "as the final arbiter of [the State's] own constitution." *Ibbison v. Quiros*, No. 3:22-CV-01163 (SVN), 2023 WL 1766440, at *17 (D. Conn. Feb. 3, 2023).

## IV.    CONCLUSION

For the reasons above, I grant in part and deny in part the motion for summary judgment (ECF No. 58). I grant summary judgment on Count Three of Laurencin's third amended complaint and on the selective enforcement theory of liability in Count Two. I also decline to exercise supplemental jurisdiction over the novel and complex state law claim in Count Four and dismiss that claim without prejudice. I deny summary judgment on Count One and the discriminatory application theory of liability in Count Two.

IT IS SO ORDERED.

_____
/s/
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
         September 28, 2023